IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TROY LEFEGED, et al.                          :

                                              :

    v.                        : Civil Action No. DKC 2004-2858

                                              :

ROBERT NICHOLS, et al.                        :

                                              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights case is a motion by Defendants Robert Nichols and Montgomery County, Maryland, for summary judgment. (Paper 24). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background**

Unless otherwise stated, the following facts are either uncontroverted or construed in the light most favorable to Plaintiffs Troy Lefeged and Sakesha Addison. This action arises from an undercover police operation conducted by Montgomery County police detectives on December 22, 2003. On the day in question, Defendant Robert Nichols of the Montgomery County Police Department, a detective working in the Repeat Offender's Section, was assigned to patrol Milestone Shopping Center in order to

protect against shoplifters and package snatchers during the holiday season. Detective Nichols was driving an unmarked police car and was wearing plain street clothes.

While on patrol, Detective Nichols observed a dark-colored sedan that was double-parked in the parking lot of Best Buy.[1] The sedan appeared to be a former police car - either a Chevrolet Caprice or a Ford Crown Victoria. Detective Nichols did not believe that the sedan had a front license tag. He observed that the driver was an African-American male in his twenties and the front seat passenger was an African-American female of the same age. (Paper 24, ex. 2, Nichols dep. at 13, 15). He watched the car as it followed a woman and her child who left Best Buy carrying shopping bags. When the woman loaded the car and pulled out of the parking spot, the driver of the sedan did not take the available space, but instead circled around in the parking lot. The driver of the sedan next followed a female teenager carrying several shopping bags to her car. Detective Nichols noted that the occupants of the sedan appeared to watch the girl, but did not take the prime parking space that the girl vacated, which was not far from the store's entrance. Detective Nichols testified that, in his experience, this behavior can be indicative of package snatching. *Id*. at 28.

---

[1] Detective Nichols testified that he thought the car was black. (Paper 24, ex. 2, Nichols dep. at 13).

The sedan left the Best Buy parking lot and drove toward Kohl's and Pet Smart, out of Detective Nichols's sight. Detective Nichols drove into the Pet Smart parking lot but was unable to find the sedan. He then drove into the Kohl's parking lot, and radioed other officers on his patrol team to keep a lookout for the car. In the parking lot for Kohl's, Detective Nichols saw what he believed to be the same sedan he had been following at Best Buy - a dark-colored ex-police car. Detective Nichols observed Mr. Lefeged, an African-American male fitting the description of the driver of the car he had seen at Best Buy, exit the driver's seat.[2] Ms. Addison, an African-American female, exited the front passenger seat. Ms. Addison's mother, Lily Mae Chambers, exited the rear of the car. All three individuals walked into Kohl's. Detective Nichols believed that, based on what he had observed in the Best Buy parking lot, further observation of these individuals was warranted. Accordingly, Detective Nichols radioed to other

---

[2] There is no dispute that at the time of the incident, Mr. Lefeged owned and was driving a four-door, dark blue 1988 Chevrolet Caprice. (Paper 24, ex. 3, Lefeged dep. at 8-9). Although Detective Nichols stated that he thought the car he saw in Best Buy was black, he clarified: "[W]hen I described the vehicle at Best Buy and I described the vehicle at Kohl's, I believe they're one in the same, so the description is the same." (Paper 24, ex. 2, Nichols dep. at 26). Likewise, although Mr. Lefeged's car did in fact have a front license tag, Detective Nichols was not immediately aware of this fact when he spotted the car at Kohl's because he drove by the back of the car in order to obtain the tag number. He testified: "[T]o me, it was the same car and I was completely under the assumption it was the same car." *Id*. at 24.

officers on his patrol team to respond to Kohl's and assist with the surveillance.  Detective Richard Volpe volunteered to go into Kohl's and conduct the surveillance.  Detective Volpe would use his radio to communicate with Detective Nichols and let him know what was observed inside of the store.

Once inside the store, Mr. Lefeged, Ms. Addison, and Ms. Chambers split up.  Detective Volpe initially located Ms. Chambers and observed her.  Detective Volpe testified that he noticed Ms. Chambers's coat was open.  (Paper 24, ex. 6, Volpe dep. at 10).  He also stated that he watched Ms. Chambers stick her hands in a circular clothing rack with baby clothes, *id.* at 8-9, although Ms. Chambers states that she doesn't remember doing so, "unless [she] was picking up something that had dropped inside." (Paper 25, ex. 2, Chambers dep. at 25).  Detective Volpe proceeded to the store's surveillance room, where customers in the store can be observed on camera.  At Detective Volpe's direction, David Tadesse, the loss prevention supervisor at Kohl's, located Ms. Chambers with the store's camera.  At that time, Ms. Chambers was walking toward the door to the store.  Detective Volpe testified that: "Her jacket was closed up now and I think she had her hands in her pockets . . . , and she looked bigger to me.  I thought maybe she had shoplifted." (Paper 24, ex. 6, Volpe dep. at 14).  Using his radio, Detective Volpe communicated all of his observations regarding Ms. Chambers to Detective Nichols.  Ms. Chambers left the store and stood

outside the Kohl's exit to smoke a cigarette.  After finishing the cigarette, Ms. Chambers proceeded to another store to continue shopping.

After Ms. Chambers left Kohl's, Detective Volpe, still in the store's surveillance room, began to observe Mr. Lefeged and Ms. Addison.  Ms. Addison looked at children's clothing.  Mr. Lefeged went to the toy section to look for a doll for his daughter.  He selected a Barbie doll.[3]  While Mr. Lefeged looked at other items, he at times would put down the Barbie doll.  Detective Volpe testified that the practice of putting items down in different places and then picking them back up may be consistent with shoplifting.  (Paper 24, ex. 6, Volpe dep. at 17).

At some point, Mr. Lefeged went to look at children's clothing.  While in the children's clothing area, Mr. Lefeged browsed through sweat pants and sweat tops, which were on sale. Mr. Lefeged tried to find all of his children's sizes amongst the shirts and pants, but had some trouble.  At times, he crouched, bent, and kneeled down to look at the lower racks.  Mr. Tadesse described  Mr. Lefeged as "bending down" and "crawling on the floor" and stated that he was "laying on the floor at some point."[4]

---

[3] Detective Volpe testified that Mr. Lefeged appeared to pick up two Barbie dolls, a fact which Mr. Lefeged disputes.  (Paper 24, ex. 6, Volpe dep. at 17).

[4] Mr. Lefeged denies ever lying on the floor.  (Paper 25, at 5).

(Paper 24, ex. 8, Tadesse dep. at 10-11).  Mr. Lefeged occasionally would go completely out of view of the security cameras.

From time to time, Mr. Lefeged and Ms. Addison met up.  Mr. Lefeged testified that they circled the store looking for Ms. Chambers on multiple occasions, but were unsuccessful.  (Paper 25, ex. 3, Lefeged dep. at 30).  Detective Volpe testified that at times Mr. Lefeged would walk around the store but did not appear to be looking for anyone and looked as if "he was looking at some of the cameras sometimes." *Id.* at 23.  After approximately an hour, Mr. Lefeged and Ms. Addison proceeded to the cash registers.  They waited in line for approximately fifteen minutes, at which time Mr. Lefeged purchased a Barbie doll and Ms. Addison purchased her items.  Both then left the store and proceeded to Mr. Lefeged's car.

At or about the same time that Plaintiffs were in line to pay for their purchases, Detective Volpe radioed Detective Nichols to communicate his observations regarding Mr. Lefeged.  Detective Volpe stated that he did not see Mr. Lefeged steal anything, but that "when [Mr. Lefeged] was bending down, if [Mr. Lefeged] had an opportunity to conceal something, he certainly could have." (Paper 24, ex. 6, Volpe dep. at 19).  Detective Nichols testified that at this time, based on his observations in the Best Buy parking lot and the conduct seen in Kohl's as reported to him by Detective Volpe, he decided to do an investigative stop.  After making this

determination, but before making the stop, another officer advised him that Mr. Lefeged's vehicle had a front license tag. Nevertheless, Detective Nichols proceeded to make the stop.

When Mr. Lefeged and Ms. Addison returned to Mr. Lefeged's vehicle, Detective Nichols, along with approximately seven other officers, approached the car.  A police van blocked Mr. Lefeged's car so that Plaintiffs could not leave.  Detective Nichols knocked on the driver's side window, which Mr. Lefeged rolled down. Detective Nichols asked Mr. Lefeged for his license and registration, which Mr. Lefeged provided after Detective Nichols identified himself as a police officer.  At this point, Plaintiffs' and Defendants' versions of what happened differ.

Mr. Lefeged testified that Detective Nichols asked him to get out of the vehicle and that Detective Nichols "walked him to the back of the car."   (Paper 25, ex. 3, Lefeged dep. at 39). Detective Nichols stood behind Mr. Lefeged and told him to "spread his feet" and put his hands on the trunk of the car.  *Id*. at 41. Detective Nichols then emptied Mr. Lefeged's pockets and placed the contents on the trunk of the car.  Next, Detective Nichols patted down Mr. Lefeged's exterior clothing, from his shoulders down to his feet.  He also shook Mr. Lefeged's hat.  After the initial pat-down search, Detective Nichols began asking Mr. Lefeged questions regarding whether he had stolen anything from Kohl's, to which Mr. Lefeged responded that he had not stolen anything.  Detective

Nichols then asked Mr. Lefeged if he could check in his pants to see if he was hiding anything.  Mr. Lefeged refused.  *Id*. at 42-43. Mr. Lefeged then unbuckled and unzipped his pants and showed Detective Nichols that he was wearing boxer shorts and asked: "With boxers, how am I going to hold something?"  Mr. Lefeged then shook his boxers and his leg to show that nothing fell out onto the ground.  *Id*. at 43.  As Mr. Lefeged went to close up his pants, Detective Nichols "reached out and pulled [the elastic of Mr. Lefeged's] underwear out."  *Id*.  While Detective Nichols pulled on the elastic, he held Mr. Lefeged's arm and looked inside his underwear.  In response, Mr. Lefeged pulled away, and then asked Detective Nichols if he was under arrest.  Detective Nichols said no, and Mr. Lefeged then told the detective that he was leaving.

Although it is not entirely clear when it occurred, at some point during the stop, Detective Nichols asked Mr. Lefeged if he could check his bags.  Mr. Lefeged refused.  (Paper 25, ex. 3, Lefeged dep. at 47).  Detective Nichols then told him to open the back car door, which Mr. Lefeged also refused to do.  *Id*.  At that point, Detective Nichols reached to open the back door himself but Mr. Lefeged told him that he would open it because the latch was broken.  Mr. Lefeged stated that the door had to be opened a certain way so that the handle did not fall off.  Mr. Lefeged opened the door so that it was ajar, but then Detective Nichols opened the door fully and again asked Mr. Lefeged to open his bags.

Mr. Lefeged responded: "I'm not opening my bag." *Id*. Mr. Lefeged then told the officer that not all of the bags were his, and, after the officer asked, Mr. Lefeged identified the bag that belonged to him. Mr. Lefeged handed the bag to Detective Nichols, who again told Mr. Lefeged to open it. Mr. Lefeged refused and noted that the receipt was sitting on top of the doll and could be seen through the bag. After Mr. Lefeged again refused to open the bag, Detective Nichols opened the bag himself. Detective Nichols then asked Mr. Lefeged to open other bags that were in the back seat. Mr. Lefeged explained to the officer that the other bags did not belong to him, and that he was not sure what was in them. Mr. Lefeged told the officer that some of the bags belonged to his mother. Detective Nichols proceeded to open approximately two of the bags that were in Mr. Lefeged's back seat.[5] Mr. Lefeged also testified that Detective Nichols asked him to consent to a search of the trunk of the car. Mr. Lefeged refused and the trunk never was opened.

While Detective Nichols was involved with Mr. Lefeged, another officer, Detective Matthews spoke with Ms. Addison.[6] The officer

---

[5] Mr. Lefeged stated that Detective Nichols searched approximately two of the other bags that were in the back seat. (Paper 25, ex. 3, Lefeged dep. at 49). Ms. Addison testified that Detective Nichols opened and looked in "all of them." (Paper 25, ex. 1, Addison dep. at 46).

[6] Although Ms. Addison testified that she did not know the officer's name, Defendants identify the officer as Detective Matthews. (Paper 28, at 12).

asked Ms. Addison how long she had known Mr. Lefeged, if she was his girlfriend, and if she had a receipt for her things.   In response, Ms. Addison told the officer that she had known Mr. Lefeged for about fifteen years, that she was not his girlfriend, and that she had paid for her items.   The officer then asked how she paid and, when she responded that she had used her debit card, he asked to see her card and her receipt.   Ms. Addison then located her receipt and card and showed the items to the officer.   Ms. Addison testified that at some point, the officer took a bag out of her hand, asked her to open her coat, and asked her to pull on her pockets to show that she had not stolen any items.[7]  Ms. Addison complied with all of the officer's requests.   During the entire interaction, Ms. Addison remained seated in the passenger seat with the door open and her feet outside of the car.[8]

Defendants' version of what transpired during the stop is different.   Defendants state that after Mr. Lefeged gave Detective Nichols his license and registration, Mr. Lefeged "got out of his car and he and Detective Nichols went to the rear of the vehicle." (Paper 24, at 7).   Detective Nichols testified that he told Mr.

---

[7] It is not clear what "bag" this was.   Ms. Addison did not state that the officer opened the bag or asked her to open the bag.

[8] Plaintiffs state in the complaint that the officers demanded that Ms. Addison get out of the car.   (Paper 2, at 5).   This is not consistent with Ms. Addison's testimony (paper 25, ex. 1 at 25), is not mentioned in Plaintiffs' opposition memorandum, and appears to be a typographical error.

Lefeged that Kohl's had called about a complaint of shoplifting.[9] (Paper 24, ex. 2, Nichols dep. at 63).  At that point, Detective Nichols testified that Mr. Lefeged denied stealing anything and stated: "No, you can check."  *Id.*  When Detective Nichols asked, "Do you mind if I check?" Mr. Lefeged responded: "No, not at all." *Id.*  At that point, Mr. Lefeged turned around and put his hands on the trunk which, to Detective Nichols, "was completely complying with, 'Go ahead and search me.'" (Paper 24, ex. 2, Nichols dep. at 63).  Detective Nichols then conducted a pat-down search of Mr. Lefeged's outer clothing.  He did not feel "any bulges in his pockets."  The officer then asked Mr. Lefeged if there was anything inside of his jacket.  In response, Mr. Lefeged said no and unzipped his jacket and held it open.  Detective Nichols then asked Mr. Lefeged if he minded if Detective Nichols checked to make sure there was nothing inside of his waist band, which the officer then proceeded to do.  *Id.* at 64.  Defendants state in their reply that "Mr. Lefeged facilitated [the waistband search] by unfastening his pants and shaking his boxer shorts."  (Paper 28, at 9).  Detective Nichols testified that in completing the pat-down search and waist-band check, he primarily was looking for stolen goods and that he

---

[9]  Defendants state in their motion that this statement actually was not true and that although Detective Volpe, and not Kohl's personnel had made the observations, "it is standard police practice not to reveal the exact manner of undercover police surveillance."  (Paper 24, at 7).

"wasn't really concerned about a gun." (Paper 25, ex. 2, Nichols dep. at 68).

With regard to the search of Mr. Lefeged's car, Defendants maintain that after the pat-down search, Detective Nichols advised Mr. Lefeged that the situation could be resolved easily if he could produce a sales receipt from the item that he purchased. Defendants' contentions as to what happened next are varied slightly.  In their motion for summary judgment, Defendants state that Mr. Lefeged went into the back seat, took out a receipt, and showed it to Detective Nichols.  Detective Nichols then told Mr. Lefeged he was sorry for the misunderstanding and stated that Mr. Lefeged was free to go.  (Paper 24, at 8).  At his deposition, Detective Nichols stated that Mr. Lefeged said that he had a receipt and told the officer that he could look in the back seat in the bags.  Detective Nichols then removed two bags from the back seat and looked in them.  (Paper 24, ex. 2, Nichols dep. at 80).  In their reply memorandum, Defendants state that Detective Nichols's question regarding whether Mr. Lefeged could produce a receipt for the items from Kohl's "lead to his inquiry regarding the shopping bags located in the back seat of the car." (Paper 28, at 10).  Defendants state that because the car door was not functioning properly, Mr. Lefeged opened the door for the officer. Detective Nichols then opened approximately two of the bags.  After

the receipts were verified against the items, Detective Nichols told Mr. Lefeged that he was free to go.[10]

With regard to Ms. Addison, Defendants' version of the events is not that different from what Plaintiffs assert transpired. Defendants state in their motion that upon questioning Ms. Addison indicated that she had not stolen anything and voluntarily opened her purse to show the officer its contents.  The officer asked her to open her coat to show there was nothing in it.  Ms. Addison did so and also showed the officer her debit card and a receipt.  In the reply memorandum Defendants further state that Ms.  Addison also "produced a shopping bag" during the course of her interactions with the officer.

**B.  Procedural Background**

On July 23, 2004, Plaintiffs filed a civil action against Defendants Robert Nichols and Montgomery County, Maryland (the "County") in the Circuit Court for Montgomery County.  On September 3, 2004, the case was removed to this court on the basis of federal question jurisdiction.

Plaintiffs assert violations of federal and state constitutional rights, as well as various state common law tort claims.  Mr. Lefeged alleges the following counts: (1) Count I, false imprisonment against both Defendants; (2) Count II, battery, against both Defendants; (3) Count III, invasion of privacy,

---

[10] Defendants' version of events in the reply memorandum most closely parallels Plaintiffs' recounting.

against both Defendants; (4) Counts IV and V, violations under 42 U.S.C. § 1983 of his federal civil rights for unreasonable search and seizure against Detective Nichols; (5) Count VI, violation of his equal protection rights under 42 U.S.C. § 1983 (racial profiling claim), against Detective Nichols; (6) Counts VII and VIII, violations of Article 26 of the Maryland Declaration of Rights, against both Defendants; and (7) Count IX, violation of Article 24 of the Maryland Declaration of Rights, against both Defendants.

Ms. Addison alleges the following counts: (1) Count X, false imprisonment, against both Defendants; (2) Count XI, invasion of privacy, against both Defendants; (3) Counts XII and XIII, violations under 42 U.S.C. § 1983 of her federal civil rights for unreasonable search and seizure, against Detective Nichols; (4) Count XIV, violation of her equal protection rights under 42 U.S.C. § 1983 (racial profiling claim), against Detective Nichols; (5) Count XV and XVI, violations of Article 26 of the Maryland Declaration of Rights, against both Defendants; and (6) Count XVII, violation of Article 24 of the Maryland Declaration of Rights, against both Defendants.

Plaintiffs collectively seek $36 million in compensatory damages, $36 million in punitive damages, costs, reasonable attorneys' fees, prejudgment interest, and other relief that the court deems just and appropriate. On September 2, 2005, Defendants filed a motion for summary judgment on all claims. (Paper 24).

14

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential

element . . . necessarily renders all other facts immaterial."
*Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the
nonmoving party will have the burden of proof, it is his or her
responsibility to confront the motion for summary judgment with an
affidavit or other similar evidence in order to show the existence
of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256;
*Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of
evidence in support of the nonmovant's position will not defeat a
motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d
529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must
be "sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party. If the evidence is merely
colorable, or is not significantly probative, summary judgment may
be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

The inquiry involved on a summary judgment motion "necessarily
implicates the substantive evidentiary standard of proof that would
apply at the trial on the merits."  *Anderson*, 477 U.S. at 252.
Where the movant also bears the burden of proof on the claims at
trial, it "must do more than put the issue into genuine doubt;
indeed, [it] must remove genuine doubt from the issue altogether."
*Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)
(internal quotation omitted), *cert. denied*, 530 U.S. 1204 (2000);
*see also Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820,
822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient

for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation and italics omitted).   Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).

## III. Analysis

## A.  § 1983 - Federal Constitutional Claims

Defendants argue that they are entitled to summary judgment on the § 1983 claims because Plaintiffs' constitutional rights were not violated and, even assuming there were violations, the doctrine of qualified immunity shields Detective Nichols from personal liability with respect to all of Plaintiffs' federal constitutional claims.[11]

---

[11] In the caption of their complaint, Plaintiffs note that Detective Nichols is sued in both his "personal and official capacity," but Plaintiffs do not indicate whether all counts are brought against Detective Nichols in both capacities.   "Official-capacity suits . . ., generally represent only another way of pleading an action against an entity of which an officer is an agent."   *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks and citation omitted).   Moreover, "damages may be awarded against a defendant in his official capacity only if they would be recoverable against the governmental entity itself." *Hughes v. Blakenship*, 672 F.2d 403, 406 (4th Cir. 1982).   Plaintiffs do not assert federal constitutional claims against the County.
(continued...)

17

Entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *see also Jones v. Buchanan*, 325 F.3d 520, 526-27 (4th Cir. 2003).   The court first must resolve the issue of whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201.   If the evidence establishes a violation of a constitutional right, "[t]he next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. *Id.*   If the answer is no, that is, that a right is not "clearly established," the qualified immunity doctrine shields a defendant officer from liability from suit.   The court should make a ruling on the qualified immunity issue "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier,* 533 U.S. at 200.

---

[11](...continued)
More importantly, with respect to the federal constitutional claims against Detective Nichols, Plaintiffs do not allege any official policy or custom that governed the alleged conduct of the officer, a necessary component of a suit against an officer in his official capacity. *Id.* (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978)).  Accordingly, the court will construe the federal constitutional claims against Detective Nichols as brought only in his personal capacity. *See Biggs v. Meadows*, 66 F.3d 56, 58 (4th Cir. 1995) ("A court must look to the substance of the complaint, the relief sought, and the course of proceedings to determine the nature of a plaintiff's claims[,]" and  whether the defendant is sued in their individual versus official capacities.").

## 1.   Violation of Fourth Amendment Rights

### a.   The Seizure

Plaintiffs assert that Detective Nichols seized them in violation of their Fourth Amendment rights because there was not reasonable suspicion or probable cause to detain them.  Defendants counter that the seizure was legally justified because it was based on a reasonable suspicion that Plaintiffs had shoplifted and because the scope and duration of the seizure was reasonable.

The Fourth Amendment, in pertinent part, provides individuals the "right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  An individual is seized within the meaning of the Fourth Amendment when that person yields to any official "show of authority" that a reasonable person would interpret as a command to restrict his or her movement.  *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991).  It is undisputed that Plaintiffs were seized when Detective Nichols and the other officers stopped them and blocked in Mr. Lefeged's car with a van.  The court must determine whether the seizures were unreasonable and therefore in violation of the Fourth Amendment.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "[t]he police can stop and detain a person for investigative purposes 'if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *Park v. Shiflett*, 250 F.3d

843, 850 (4th Cir. 2001) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Although "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In other words, something more than an unparticularized suspicion or hunch is required.  *Sokolow*, 490 U.S. at 7.  The court must look at the totality of the factors relied upon by the officers in determining whether there was reasonable suspicion to stop Plaintiffs.  *See United States v.* Cortez, 449 U.S. 411, 417 (1981); Park, 250 F.3d at 851.

Defendants rely on the following circumstances to justify the seizure of Mr. Lefeged and Ms. Addison: (1) the activity of the dark sedan in the Best Buy parking lot, which Detective Nichols believed to be the same car as the sedan Mr. Lefeged drove; (2) the activities of Ms. Chambers, who Defendants maintain immediately split off from Plaintiffs in Kohl's, reached into the middle of clothing racks, and left with her coat fully buttoned (although it was opened when she came into the store) and with the appearance that she was bigger; and (3) the behavior of Mr. Lefeged, who crouched low to the floor in Kohl's, periodically went in and out of camera view, picked up a doll and left it in different locations, returning to it later, and appeared to Detective Volpe

20

to pay an inordinate amount of attention to the surveillance cameras.

As this court has noted, "[w]hether there is reasonable suspicion is based largely on the common sense and experience of the investigating officer." *Kebe v. Brown*, 161 F.Supp.2d 634, 641 (D.Md. 2001). Defendants assert that Detective Nichols relied on his own observations regarding the car he believed belonged to Mr. Lefeged and the information relayed by Detective Volpe about the activity in Kohl's to justify the investigative stop. Detective Nichols testified that, based on his knowledge and experience as a detective, he believed that the initial observations of the sedan were indicative of package-snatching and that Mr. Lefeged's behavior in Kohl's was consistent with someone who is shoplifting. Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have presented evidence from which a factfinder could conclude that Detective Nichols's belief that the cars were the same was not reasonable. *See United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (noting that a mistaken belief can furnish the grounds for a *Terry* stop, if the officer does not know it is mistaken *and is reasonable* in acting upon it), *cert. denied*, 126 S.Ct. 1894 (2006). According to Detective Nichols, the car he saw in Best Buy was black, and not blue like Mr. Lefeged's car. Detective Nichols testified that he only saw two people in the sedan at Best Buy, while three people exited Mr. Lefeged's car.

Moreover, Detective Nichols stated that he believed that the car in the Best Buy parking lot did not have a front license tag.  Despite being informed prior to the investigative stop that Mr. Lefeged's car did in fact have a front tag, Detective Nichols still went ahead with the stop.[12]  Defendants also fail to provide any evidence of a link between a propensity to shoplift and a propensity to snatch packages - that is, there is no evidence that it was reasonable for Detective Nichols to believe that Mr. Lefeged drove the car he saw in the Best Buy parking lot because individuals who engage in package snatching are also likely to shoplift, and Mr. Lefeged exhibited behaviors consistent with shoplifting.  With regard to Mr. Lefeged's conduct in Kohl's, viewing the evidence in the light most favorable to Plaintiffs, the acts of crouching or kneeling low to the floor while looking at merchandise, walking out of sight of the security camera, putting down a doll while looking at other items but later purchasing the doll, and appearing to look at the store's security cameras, without more, are not sufficient

---

[12] In fact, there is some evidence suggesting that at the time of the stop, based on the fact that Mr. Lefeged's car had a front license tag, Detective Nichols did not believe that Mr. Lefeged was the driver of the sedan he saw in Best Buy.  Detective Nichols testified regarding the sedan he saw in Best Buy: "I believed it did not have a front tag.  I didn't get a great look, but to my - I still believe, at this moment, it didn't have a front tag." (Paper 24, ex. 2, Nichols dep. at 14).  Although somewhat of an obvious point, Detective Nichols's initial belief that Mr. Lefeged was the driver of the sedan in the Best Buy parking lot cannot provide a basis for the investigative stop if, prior to the time the stop was made, the information regarding Mr. Lefeged's license plate was sufficient to change Detective Nichols's mind regarding this belief.

to show, as a matter of law, that Defendants had a reasonable suspicion to stop Mr. Lefeged.

With regard to Ms. Addison, Detective Volpe did not observe *any* suspicious behavior on her part when she was inside of Kohl's. Moreover, there is no evidence that Ms. Addison was acting in concert with Mr. Lefeged or Ms. Chambers to help them achieve some criminal scheme, or that, at the time, Detective Nichols believed that any sort of joint criminal activity had occurred inside of Kohl's. For example, there is no indication that any officer observed Ms. Addison switching bags or merchandise with Mr. Lefeged, or making a distraction so that Mr. Lefeged or Ms. Chambers could steal something.[13] *See Jenkins v. Wal-Mart Stores, Inc.*, 601 So.2d 21, 23 (La. 1992) (holding that the detention of one individual was reasonable, even where that person did not actually take any merchandise, because he accompanied a shoplifter and the two appeared to be working together). In fact, the only evidence proffered by Defendants to justify the stop of Ms. Addison is Detective Nichols's belief that she rode in the sedan as it followed two customers in the Best Buy parking lot and then failed to park in the customers' vacated parking spots. As noted, the evidence does not show conclusively that Detective Nichols's belief

---

[13] Likewise, any conduct on the part of Ms. Chambers while she was in Kohl's would not justify stopping Mr. Lefeged or Ms. Addison absent some evidence that the individuals acted in concert or that Detective Nichols reasonably believed that they were acting in concert. Defendants provide evidence of neither.

that the sedan in the Best Buy lot and Mr. Lefeged's car were the same vehicle was reasonable.

**b.  The Search**

Even if the stop was justified, Mr. Lefeged maintains that he was unlawfully searched when Detective Nichols looked inside of his underwear, searched his vehicle, and demanded and obtained his identification and vehicle registration.  Ms. Addison alleges that she was unlawfully searched when Defendant Nichols demanded and obtained her identification and debit card.  With regard to Mr. Lefeged, Defendants argue that he consented to the search of his person and his car and that the investigative stop was "brief, minimally intrusive, and ended promptly when suspicion of shoplifting was dispelled." (Paper 24, at 14).  With regard to Ms. Addison, Defendants maintain that upon being asked, she voluntarily opened her coat and purse to demonstrate that she had not stolen any merchandise, and thus consented to the search.  Moreover, in their reply memorandum, Defendants point out that although Detective Nichols ordered the investigatory stop, he did not search or question Ms. Addison; she  interacted with another officer, Detective Matthews, and therefore no liability can attach to Detective Nichols.

Police officers conducting an investigative *Terry* stop are entitled "to conduct a carefully limited search of the outer clothing" of a suspect "in an attempt to discover weapons which

might be used to assault" the officer, where there is a reasonable fear for the officer's and others' safety. *Terry*, 392 U.S. at 30-31. However, "[o]nce an investigative stop has been completed 'any further detention or search must be based on consent or probable cause.'" *United States v. Poole*, 718 F.2d 671, 674 (4th Cir. 1983) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975)).

Detective Nichols's search of Mr. Lefeged's person and of the bags in his car clearly surpass the "limited search of the outer clothing" to discover weapons that is allowed under *Terry*. Moreover, although Defendants state that a *secondary* purpose of the pat-down search was to discover weapons, they readily admit and Detective Nichols testified that the primary purpose was to search Mr. Lefeged for stolen goods. Their defense regarding the search of Mr. Lefeged and his car is based on their assertion that he consented. Consent may be voluntary "even if it is procured during an illegal detention, provided that the totality of the circumstances confirms that the consent was not coerced." *United States v. Boone*, 245 F.3d 352, 363 (4th Cir. 2001). Mr. Lefeged, however, disputes Defendants' contention and testified that he affirmatively stated he did not consent several times during the interaction with Detective Nichols. For purposes of this motion,

the court must accept Mr. Lefeged's contentions as true. Defendants' position therefore is without merit.[14]

With regard to Ms. Addison, Detective Nichols testified that it was his decision to make the stop: "I made the decision to go ahead and let's do an investigative stop and let's talk to these people, get them identified and find out what's going on." (Paper 25, ex. 2, Nichols dep. at 56). Likewise, Ms. Addison testified that upon initially stopping Plaintiffs, Detective Nichols "sent another gentlemen to [her] side" of the car. (Paper 25, ex. 1, Addison dep. at 24). Although another officer actually questioned Ms. Addison, the role of Detective Nichols with regard to the interaction is not entirely clear. For example, it is unclear if Detective Nichols directed the officer to ask certain questions, or to conduct a search of Ms. Addison. Defendants' conclusory statement in their reply memorandum that Detective Nichols can't be liable because he wasn't the one actively questioning or searching Ms. Addison, offered without any case law support, is an insufficient basis upon which to rest summary judgment.

---

[14] Plaintiffs' allegation that Detective Nichols's initial request for Mr. Lefeged's license and registration constituted an unreasonable search is without legal basis. *See United States v. Drayton*, 536 U.S. 194, 200-01 (2002) (noting that even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search a person's bags, provided they do not induce cooperation through coercive means); *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir.) (noting that an officer making an investigative traffic stop may request a driver's license and vehicle registration, among other things), *cert. denied*, 506 U.S. 926 (1992).

Like with Mr. Lefeged, Defendants also maintain that Ms. Addison consented to the search.  However, Ms. Addison disputes that she consented.   Although she concedes that she did not expressly object to being searched, and, upon being asked, opened her coat, shook her pockets, and produced her debit card and receipt, Ms. Addison characterizes her conduct as mere acquiescence to the officer's show of authority.  For purposes of this motion, the court must accept as true that Ms. Addison did not consent to the search.  *See United States v. Mendenhall*, 446 U.S. 544, 557 (1980) ("The question whether the respondent's consent . . . was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances . . . ., and is a matter which the Government has the burden of proving.") (internal citation omitted); *United States v. Vickers*, 387 F.2d 703, 706 (4th Cir. 1967) ("Whether consent was voluntarily and intelligently given is a question of fact as to which the government has the burden of proof."), *cert. denied*, 392 U.S. 912 (1968).

**c.  Qualified Immunity**

Because the facts, as alleged by Plaintiffs, are sufficient to show that Detective Nichols's conduct violated Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, the court must consider whether Detective Nichols is entitled to the defense of qualified immunity.  Detective Nichols

may be entitled to qualified immunity if it is shown that he had an objectively reasonable basis for believing in the lawfulness of his acts. *Jones,* 325 F.3d at 531.  Officers are entitled to summary judgment on the basis of qualified immunity if they can show that reasonable officers could have believed that their actions were lawful in light of both "clearly established law and the information that the . . . officers possessed" at the time. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

With regard to Plaintiffs' seizure, in *Turmon v. Jordan*, 405 F.3d 202 (4th Cir. 2005), the United States Court of Appeals for the Fourth Circuit noted:

> When [the police officer defendant] seized [the plaintiff] on March 10, 2001, it was clearly established that a police officer must have "reasonable suspicion supported by articulable facts that criminal activity may be afoot" in order to justify an investigative detention. *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (internal quotation marks and citation omitted).  The general right to be free from unreasonable seizures is as old as the Fourth Amendment, and the specific requirement that a police officer have "some minimal level of objective justification" before seizing a person was established by at least 1968 when the Supreme Court decided *Terry v. Ohio*. *See id*.  Moreover, we have found no basis for reasonable suspicion in circumstances that appeared to be less innocent than those in the present case.  In *United States v. Burton*, 228 F.3d 524, 528-29 (4th Cir. 2000), for example, we held that officers could not pat down an individual, whom they had no reason to suspect was engaged in criminal activity, simply because he was standing by a telephone booth, refused to answer their questions, and refused

to remove his hands from his pockets when
asked to do so.

*Turmon*, 405 F.3d at 206.   Here, if the facts as alleged by
Plaintiffs are taken as true, there is a sufficient basis upon
which to conclude that Detective Nichols did not have a reasonable
suspicion on which to justify stopping Plaintiffs.   Plaintiffs
assert that they did not drive through the Best Buy parking lot.
The car that Detective Nichols saw at the Best Buy lot was a
different color and had a different number of occupants than Mr.
Lefeged's car.   Moreover, Detective Nichols stated that the car he
initially saw did not have a front license tag, and there is no
dispute that Mr. Lefeged's car had a front tag and that Detective
Nichols knew this fact prior to stopping Plaintiffs.   While inside
of the store, Mr. Lefeged's acts of crouching to look at items,
occasionally going out of view of the security cameras, putting
down a doll while he browsed the store but later paying for it, and
appearing to look at the security cameras as he walked through the
store, without more, is an insufficient basis upon which to
conclude as a matter of law that Detective had a reasonable
suspicion to stop Mr. Lefeged.   Moreover, there is no evidence that
Ms. Addison did anything suspicious while she was in Kohl's.   There
also is no evidence that Ms. Addison aided Mr. Lefeged or Ms.
Chambers in completing any criminal act or that Detective Nichols
believed that the three acted in concert.   Because it was clearly
established at the time of the incident that Plaintiffs had a right

to be free from an unreasonable seizure in the absence of a "minimal level of objective justification," based on the facts as alleged by Plaintiffs, Detective Nichols is not entitled to qualified immunity and Defendants' motion for summary judgment on Plaintiffs' § 1983 Fourth Amendment unreasonable seizure claims, Counts IV and XII, will be denied.

With regard to the search of Mr. Lefeged's person and his car, and the search of Ms. Addison, the circumstances surrounding the searches are in dispute. "When resolution of a case depends on determining what actually happened, 'the issue is inappropriate for resolution by summary judgment.'" *Vathekan v. Prince George's County*, 154 F.3d 173, 180 (4th Cir. 1998) (quoting *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992)). This is because "[d]isputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995). Here, the parties present different versions of what occurred, namely, whether Plaintiffs consented to be searched. "Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge." *Summerlin v. Edgar*, 809 F.2d 1034, 1039 (4th Cir. 1987).

It was clearly established at the time of the incident that, once an investigatory stop has been completed, "any further detention or search must be based on consent or probable cause."

*Brignoni-Ponce*, 422 U.S. at 882.  Plaintiffs' proffer evidence that they did not consent to be searched.  This evidence is sufficient to raise a genuine dispute of material fact precluding summary judgment on qualified immunity grounds with regard to the searches. The motion to dismiss Plaintiffs' § 1983 Fourth Amendment unreasonable search claims, Counts V and XIII, is therefore denied.

## 2.  Violation of Equal Protection - Racial Profiling

Plaintiffs allege in the complaint that Detective Nichols violated their Fourteenth Amendment right to equal protection under the law because he targeted them for "observation, detention, harassment, searching, and other actions" based on their race. Defendants argue in their motion that they are entitled to a grant of summary judgment on the equal protection claim because Plaintiffs' claim is based "strictly on bald allegations and conclusory legal assertions."  Defendants proffer the deposition testimony of Detective Nichols, who stated that he began following a dark sedan based on the suspicious activities of its driver, and, upon believing that Mr. Lefeged was the driver of the sedan, ordered further surveillance of him.  Detective Nichols testified that, after receiving additional reports of what he believed to be suspect conduct in Kohl's, he decided to conduct an investigative stop.  In their opposition memorandum, Plaintiffs do not proffer evidence of Detective Nichols allegedly racially discriminatory intent, but instead state: "Counsel for Plaintiffs is of a mind

that this case screams racial discrimination based on the totality
of circumstances and commonplace, real world experiences and
observations."[15]   (Paper 25, at 19).   Plaintiffs' conclusory
assertion that their counsel thinks that the facts "scream racial
discrimination" is insufficient to withstand a motion for summary
judgment. *See Solis v. Prince George's County*, 153 F.Supp.2d 793,
807 (D.Md. 2001) (granting summary judgment to the defendants on
a racial profiling claim where, after ample time for discovery, the
plaintiff had produced only an unsworn expert report to support the
claim, and stating: "[O]n a motion for summary judgment, bare
allegations [of racial profiling] unsupported by legally competent
evidence do not give rise to a genuine dispute of material fact.");
*Smith v. Vento*, No. Civ.A. WMN-02-1716, 2002 WL 32315489, at *2
(D.Md. Dec. 10, 2002) (granting the defendant police officer's
motion for summary judgment on a racial profiling claim where there
was no support in the record for the plaintiff's "bald and
conclusory allegation that the conduct of either trooper on the day
in question had its basis in race), *aff'd sub nom. Smith v. Md*, 53
Fed. App'x 1000 (4th Cir. 2003) (unpublished).   Accordingly, the
court will grant summary judgment to Defendants on Counts VI and
XIV, Plaintiffs' federal equal protection claims.

---

[15] Plaintiffs also state that even if the court grants summary
judgment to Defendants on the equal protection claims, the
remainder of Plaintiffs' claims should not be impacted.

**B.  State Constitutional Claims**

**1.  Article 26**

Plaintiffs allege in the complaint that Detective Nichols violated their right to be free from unreasonable searches and seizures under Article 26 of the Maryland Declaration of Rights. Plaintiffs base their claims on the same factual allegations they use to support their respective § 1983 Fourth Amendment search and seizure claims.  Plaintiffs assert that the County is liable on the theory of respondeat superior liability.  In their motion, with the exclusion of their qualified immunity arguments, Defendants adopt and incorporate the arguments made with regard to the federal Fourth Amendment claims.

Maryland courts have consistently construed Article 26 of the Maryland Declaration of Rights "*in pari materia* with the Fourth Amendment, such that [they] accord great respect and deference to the decisions of the United States Supreme Court in interpreting the federal amendment." *Carter v. State*, 367 Md. 447, 458 (2002); *see also Muse v. State*, 146 Md.App. 395, 402 n.7 (2002) ("Constructions of the federal amendment by the United States Supreme Court are controlling authority.").  Both parties agree that, with the exclusion of the qualified immunity issue, the same substantive analysis underlies resolution of the Article 26 claims. Accordingly, the same facts that supported Plaintiffs' § 1983 unreasonable seizure and search claims under the Fourth Amendment

apply with equal force to Plaintiffs' corresponding state claims under Article 26 and a grant of summary judgment to Defendants on Counts VI, VIII, XV, and XVI is not warranted.  *See Solis*, 153 F.Supp.2d at 803.

## 2. Article 24

Plaintiffs allege in the complaint that Detective Nichols violated their right to equal protection under Article 24 of the Maryland Declaration of Rights because he targeted them for "observation, detention, harassment, searching, and other actions" based on their race.  Plaintiffs assert that the County is liable on the theory of respondeat superior liability.  In their motion, with the exclusion of their qualified immunity arguments, Defendants adopt and incorporate the arguments made with regard to the federal constitutional equal protection claims.

"Although the Maryland Constitution does not contain an express equal protection clause, [the Court of Appeals of Maryland has] long held that equal protection is implicitly guaranteed by the due process provision found in Article 24 of the Declaration of Rights." *Kirsch v. Prince George's County*, 331 Md. 89, 96 (1993). The Court of Appeals of Maryland has construed the equal protection rights in Article 24 *in pari materia* with comparable rights in the Fifth and Fourteenth Amendments to the federal constitution.  *See DiPino v. Davis*, 354 Md. 18, 44 (1999); *Kirsch*, 331 Md. at 96-97.

As noted, Plaintiffs proffer no evidence that Detective Nichols targeted them because of the race.  Like with their federal equal protection claims, Plaintiffs' conclusory assertions also are insufficient to withstand Defendants' motion for summary judgment on their state equal protection claims, Counts IX and XVII.

**C. State Common Law Claims**

**1. False Imprisonment**

Plaintiffs allege false imprisonment claims against Defendants based on the alleged intentional, malicious, and unjustifiable detention of Plaintiffs against their will.  Defendants argue that Plaintiffs' false imprisonment claims fail because the stop was justified legally, Plaintiffs consented to the stop, and because the common law privilege defense shields Defendants from liability.

Defendants are correct in their assertion that if the stop was legally justified, Plaintiffs' false imprisonment claims fail.  *See Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 123 (noting that in order to state a claim for false imprisonment, a plaintiff must prove that the defendant deprived him or her of his liberty without consent and without legal justification), *cert. denied*, 360 Md. 276 (2000); *Green v. Brooks*, 125 Md. App. 349, 366 (1999) (same); *Williams v. Prince George's County*, 112 Md. App. 526, 554 (1996) ("False imprisonment . . . can only occur when there is no legal authority or justification for the arresting officer's actions.").  However, as noted, the court finds that the facts, as alleged by

Plaintiffs, are sufficient to conclude that Detective Nichols was not legally justified in conducting the investigative stop of Plaintiffs.  Moreover, other than stating that Plaintiffs did not try to leave, Defendants offer no evidence that they consented to the stop.  Instead, the undisputed evidence shows that approximately seven police officers surrounded the car and a police van was used to block Mr. Lefeged and Ms. Addison from leaving. Defendants reliance on a state common law privilege defense is misplaced, because, as the case Defendants cite shows, the defense is inextricably linked to whether the officer's actions were legally justified based on the circumstances presented.  *See Shipley v. State*, 243 Md. 262, 264-65 (1966) (affirming the defendants' convictions and finding that police officers were justified in stopping the defendants and peering into their car for dangerous weapons where the car was parked near a synagogue after midnight, it had been there more than ten minutes for no apparent reason, and there had been a rash of crimes, including burglaries, in the neighborhood).  The court therefore will deny Defendants' motion as to Counts I and X.

## 2.  Invasion of Privacy

Plaintiffs allege that Detective Nichols invaded the privacy of Mr. Lefeged when he "intentionally or maliciously, and unjustifiably" looked in Mr. Lefeged's pants and underpants, searched his vehicle and contents, demanded his identification, and

vehicle registration.   With regard to Ms. Addison, Plaintiffs
allege that Detective Nichols invaded her privacy when he demanded
and obtained her identification and debit card, and/or directed
others under his supervision to do so.   Defendants maintain that
the invasion of privacy claim fails because the investigative stop
was "reasonably justified."   Defendants, in a footnote, also argue
that the alleged intrusion upon seclusion was not "highly offensive
to a reasonable person" because a routine stop and search lasting
ten minutes "could not possibly meet this standard."   Accordingly,
the elements of invasion of privacy have not been met.

As noted, the facts, as alleged by Plaintiffs, are sufficient
to show that neither the search of Mr. Lefeged nor Ms. Addison was
legally justified.   Moreover, although Defendants are correct that
reasonableness is a factor to consider in an invasion of privacy
action, the facts, viewed in the light most favorable to
Plaintiffs, are sufficient to show that Detective Nichols's actions
were unreasonable with regard to Mr. Lefeged.   Unlike in *Ashton v.
Brown*, 339 Md. 70 (1995), cited by Defendants, Mr. Lefeged was not
simply detained.   Detective Nichols patted down Mr. Lefeged's
entire body.   After the pat-down search revealed nothing, Detective
Nichols asked if he could check inside of Mr. Lefeged's pants.
Although Mr. Lefeged allegedly refused, he did open his pants and
shake his underwear and his pants leg to show that he was not
holding any stolen items under his pants.   Even after this act

failed to reveal anything, as Mr. Lefeged went to close up his pants, Detective Nichols allegedly reached out and pulled out Mr Lefeged's underwear.  This conduct, as alleged, was not, as a matter of law, reasonable under the circumstances and, contrary to Defendants' assertions, could constitute an intrusion on Mr. Lefeged's seclusion.  Having one's underwear pulled out and looked down would be highly offensive to a reasonable person. *See Furman v. Sheppard*, 130 Md.App. 67, 73 (2000) (reciting standard); *Nieves v. State*, 160 Md. App. 647, 661 (stating that "searches of the person of any variety undoubtedly invade that individual's privacy" and stating that "deeply imbedded in our culture is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their . . . observed or touched by others") (internal quotation marks omitted), *aff'd*, 383 Md. 573 (2004).  Defendants' motion for summary judgment on Mr. Lefeged's invasion of privacy claim, Count III, will be denied.

With regard to Ms. Addison, however, the court finds that Defendants are correct in their assertion that the alleged conduct is insufficient to sustain a claim for invasion of privacy. Plaintiffs allege that Officer Matthews asked Ms. Addison for her identification and asked her to produce a receipt and her debit card.[16]  Although this questioning may not have been legally

---

[16] Although the undisputed evidence shows that Officer Matthews
(continued...)

justified, it was not necessarily unreasonable "in the sense required by the tort of invasion of privacy." *See Ashton*, 339 Md. at 118. A grant of summary judgment to Defendants on Ms. Addison's invasion of privacy claim, Count XI, therefore is warranted.

## 3. Battery

Mr. Lefeged alleges that Detective Nichols committed battery when he "intentionally or maliciously, and unjustifiably" patted Mr. Lefeged down and pulled out his clothing. Defendants maintain that the battery claim fails because Detective Nichols's actions were justified and legally authorized, the conduct at issue was not harmful or offensive, and Mr. Lefeged consented to the pat-down and search. Defendants also maintain that Detective Nichols should receive the benefit of the common law doctrine of privilege, which they maintain is applicable where "a defendant alleged to have committed an intentional tort has acted in furtherance of an interest of legitimate social importance." (Paper 24, at 23).

As noted, the court finds that the facts alleged by Plaintiffs are sufficient to show that the search of Mr. Lefeged for stolen goods, including the allegedly nonconsensual pulling out of Mr. Lefeged's underwear, was unjustified. Accordingly, the legal justification defense cannot provide the basis for summary judgment as to the battery claim. With regard to Defendants' second

---

[16](...continued)
also asked Ms. Addison to open her coat and show him her pockets, Plaintiffs do not base their invasion of privacy claim on these actions. (Paper 2, at 14-15).

argument, although Detective Nichol's conduct may not have been harmful, the act of pulling out Mr. Lefeged's underwear certainly was offensive. *See Molé v. Jutton*, 381 Md. 27, 45 n.13 (2004) ("'A touching is offensive if it offends the other person's reasonable sense of dignity.'") (quoting Maryland Pattern Jury Instructions 15:2); *Pettit v. Erie Ins. Exch.*, 117 Md. App. 212, 224 (1997) (citing the Restatement (Second) of Torts § 19 cmt. a for the proposition that for a contact to be offensive it must be one which would offend the ordinary person), *aff'd*, 349 Md. 777 (1998). Moreover, the facts are in dispute as to whether Mr. Lefeged consented, and, for purposes of this motion, the court must accept as true that he did not consent to the search of his person, including the pulling out of his underwear. Finally, Defendants' privilege defense is unconvincing. Defendants point to and the court can find no Maryland case law recognizing a privilege defense to battery where a police officer's actions were not legally justified. In fact, the treatise that Defendants' cite describes a "privilege" as "any circumstance *justifying* or excusing a prima facie tort." W. Page Keeton, Prosser and Keeton on the Law of Torts § 16 (5th ed. 1984). Accordingly, Defendants have not shown that, as a matter of law, they are entitled to judgment on Count II, Plaintiffs' battery claim.

**IV.  Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  A separate Order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
